UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MELISSA ARZU, Individually and as the Administrator of the Estate of KEVIN ISMAEL GREENIDGE, Deceased and MELISSA ARZU Individually,<br><br>      Plaintiffs,<br><br> -against-<br><br>AMERICAN AIRLINES, INC.,<br><br>      Defendant. | Case No. 1:23-cv-02116 (SDA) |

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS
& IN SUPPORT OF MOTION TO AMEND THE COMPLAINT**

Plaintiffs submit this memorandum of law in opposition to defendant's motion to dismiss and in support of plaintiffs' motion to amend their complaint.

As the Declaration of Melissa Arzu makes clear: the subject ticket was purchased in New York, plaintiff lived in New York, and plaintiff was planning on returning to his home in New York on a connecting flight, when his life was unexpectedly cut short on June 4, 2022. These contacts, together with the unique nature of this case as a failure to inspect/maintain establish specific jurisdiction in this case, as developed herein.

Defendant cites many cases in support of its motion. However, there is a substantial difference between this case and those many cases. In the cited cases, there was a tort that was actively committed in the out-of-state jurisdiction. Whether an accident occurred there, or someone did something there, something happened in that foreign state. Here, however, what we have is a failure to act entirely. Defendant failed to inspect and maintain their AED device. The tort was not necessarily committed in Honduras (where the flight departed), Mexico (where the flight emergently landed), or Florida (where the flight was originally intending to land).

1

Indeed, we do not even know where the AED was maintained, or if it was maintained at all. The documents annexed to the Declaration of Thomas P. Giuffra demonstrate that by order of May 25, 2023, we were permitted to conduct jurisdictional discovery (Exhibit 2). On May 25, 2023, plaintiff served discovery demands. These included the following two demands (Exhibit 3):

> **REQUEST NO. 12**
> Documentation regarding where and when the AED machine on board the subject flight was serviced, maintained, repaired and installed.
>
> **REQUEST NO. 12**
> Records of service, maintenance, repair and installation of the AED machine on board the subject flight.

Defendant's responses (Exhibit 4 and 5) do not reflect where prior to the subject incident of June 4, 2022 the AED was serviced, maintained, repaired and installed. In fact, counsel's email demonstrates that some of the markings around the AED are mere estimations since the AED is not directly tracked (Exhibit 5). Regarding the document that is titled the "Maintenance History" (Exhibit 4, AA 000009), counsel's clarifying email indicates in part (Exhibit 5):

> AA 009 shows:
> 1. The S/N 0079 is a pseudo serial number for the AED at issue since AA was not tracking the location of most legacy AEDs when this one was used, as shown in the following data entry "tracking 00000."
> 2. The MFG P/N is the AED manufacturer's part number and is not specific to the AED at issue.
> 3. The Install Date of 2/6/20 is a pseudo (not actual) install date for the AED at issue. It refers to the date a new AED tracking system went live.
> 4. EMP Z9999 is a pseudo (not actual) employee number for the (unknown) employee who originally installed the AED at issue.

From this document we have no idea when it was installed, maintained, inspected, or anything else. As counsel states, they were "not tracking the location of most legacy AEDs" (Exhibit 5).

Presently, not only is it unknown whether the AED was in fact serviced or installed in the State of New York, it is unknown if it was ever serviced at all. To the contrary, the record is perhaps not lacking, but it appears from defendant's own response that defendant does not even have any documentation to this effect. Without such evidence, defendant should be precluded from denying that the AED was installed or serviced in New York, or that it should have been.

In fact, defendant's failure to inspect did not just occur in Honduras; it occurred everywhere, as we are talking about something that did *not* happen. Just because the last place that this could have been fixed was perhaps Honduras (or even while the plane was in the air), that does not mean that only Honduras was the place of negligence. There is simply no indication in the record that the AED was scheduled for maintenance or inspection in Honduras or anywhere. If the ground crew in Honduras was not assigned the task and cannot be faulted for not doing it, why would the negligence be pinned on them specifically? Without a specific location of negligence, the place where the ticket is purchased and from where decedent began his trip becomes the most related to the subject negligence.

Indeed, the failure to inspect or maintain goes beyond just being an issue of what was and was not done and where. Instead, having a proper working AED on a flight is absolutely vital, and is something that should be guaranteed at the time the ticket is purchased in order to have a proper meeting of the minds as to what is being provided. CFR §121.803, which was alleged in the complaint (Exhibit 1, ¶26), specifies:

(a) No person may operate a passenger-carrying airplane under this part unless it is equipped with the emergency medical equipment listed in this section.

(b) Each equipment item listed in this section—

(1) Must be inspected regularly in accordance with inspection periods established in the operations specifications to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes;

> …
> (c) For treatment of injuries, medical events, or minor accidents that might occur during flight time each airplane must have the following equipment that meets the specifications and requirements of appendix A of this part:
> …
> (4) In airplanes for which a flight attendant is required and with a maximum payload capacity of more than 7,500 pounds, an approved automated external defibrillator as of April 12, 2004.

Here, plaintiff alleges that the AED was not working properly (Exhibit 1). Importantly, the code requires not only the presence of an AED, but that the AED be "inspected regularly". Id. Here, despite plaintiff's demands, there is no such evidence of inspections, let alone regular ones. We are left to conclude that the AED was never inspected, in violation of CFR §121.803.

Defendant's failure to inspect removes this matter from being just a personal injury case that arose *on* a flight. Instead, Defendant's significant failure constituted a factor that can invalidate the meeting of minds of purchasing an airline ticket as a passenger expects and relies on airlines to provide basic safety on board an aircraft, especially when a passenger has absolutely no control over such safety equipment.

Consequently, the failures in the present action are covered by New York's long arm jurisdiction under CPLR §302(a)(1), (2) and (3) which state:

> § 302. Personal jurisdiction by acts of non-domiciliaries. (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state…
>
> 3. …commits a tortious act without the state causing injury within the state

Here, the very selling of the ticket in New York (and causing plaintiff to leave his home and travel to Honduras in the first place), was already part of a tort, as it was a sale of ticket for a flight whose

AED had not been inspected – nor was there even a plan in place to inspect it as its location is not tracked. Additionally, since the flight being sold was already unsafe at the time of sale, the sale of the ticket in New York – and causing decedent to travel to Honduras in the first place – is what the instant case arises from. Therefore, the AED's malfunction arises from the transaction of business in New York. Decedent purchased the ticket thinking it was safe, and left New York on that basis, all while the AED was not being inspected or maintained as required - anywhere. He was essentially unknowingly stranded in Honduras and constrained to take this unsafe flight. The case of Broadus v. Delta Air Lines, Inc., 101 F. Supp. 3d 554, 561 (M.D.N.C. 2015) is instructive in this regard, stating:

> When Broadus went to board her Delta flight from Atlanta to Pensacola, a Delta employee assisted her, but did so negligently, resulting in injuries to Broadus' knees and back … But for Delta operating its airline business in North Carolina and picking up Broadus in Greensboro, Broadus would not have been injured during her layover in Atlanta. Therefore, Delta should have anticipated that, as a common carrier promising to pick Broadus up in North Carolina and return her there, it could be haled into a court in North Carolina, the state of her initial departure and final arrival, for injuries it inflicted on her during the trip. Broadus' injuries arose directly out of, and are closely related to, Delta's connection with North Carolina.

Similarly, Covington v. Am. Airlines, Civil Action MJM-22-725, at *8-9 (D. Md. Mar. 27, 2023) recently found specific jurisdiction in Maryland when plaintiff was injured when traveling from Florida to North Carolina to Maryland, and it was unclear if the injury took place in Florida or North Carolina. The Court ruled:

> The Court does not find the dispute concerning whether the incident occurred in Florida or North Carolina material to its resolution of Defendant's motion. In either event, this Court's exercise of personal jurisdiction over Defendant would be authorized … Plaintiff has made a prima facie showing that her claims arise out of and relate to Defendant's activities directed at Maryland. Plaintiff's round-trip air travel beginning and ending in Maryland, which was purchased in

Maryland, is the "genesis of the dispute" central to this litigation. See UMG Recordings, 963 F.3d at 354 ("Where activity in the forum state is 'the genesis of [the] dispute,' [the 'arising-from'] prong is easily satisfied.") (quoting Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 303 (4th Cir. 2012)). Indeed, the alleged incident and injuries that gave rise to Plaintiff's claims share a causal relationship with Defendant's business activities in Maryland. But for Defendant operating its airline business in Maryland, contracting with a Maryland resident, and providing that customer with air transportation to Maryland, Plaintiff would not have been injured, according to the Complaint. Thus, business operations and transactions in Maryland that resulted in the events and injuries alleged in this case meaningfully connect Defendant to this forum. See Walden, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

This case is also similar to Selke v. Germanwings GmbH, 261 F. Supp. 3d 666, 674 (E.D. Va. 2017). In Selke, the decedents traveled from Virginia to Munich, Germany on United, and then from Munich to Barcelona on Lufthansa. To go back home, the Selke decedents were scheduled to travel from Barcelona to Germany on Germanwings, and then from Germany to Manchester on Germanwings and from Manchester to Virginia via United. On the way home, on the leg between Barcelona and Dusseldorf, the Germanwings flight crashed due to co-pilot suicide. United sold decedents their Germanwings tickets. The court found that the tort was "arising from" Virginia contacts, holding:

> the Court notes that the reference to "arising from" in [Virgnia] Section 8.01–328.1 requires that there be a causal link between the acts relied on for personal jurisdiction and the claims detailed in the complaint … the connection between the forum and the cause of action must rise to the level of legal or proximate causation … the standard for causation that controls in this matter is better interpreted as an inquiry into whether United's activity in the forum state directly precipitated Plaintiffs' claims … United's activities in Virginia proximately resulted in Plaintiffs' cause of action. United, by its own admission, sold decedents tickets not only for the flight that carried them to Europe, but also for air carriage on Lufthansa and Germanwings for the additional legs between European

destinations. (Dkt. No. 15 at 3.) Indeed, were it not for United's role as intermediary and the contractual relationships United maintained with both Lufthansa and Germanwings, decedents would not have been able to book passage using the "conjunction tickets" provided by United.

The Second Circuit in <u>Licci v. Lebanese Canadian Bank SAL</u>, 732 F.3d 161, 168-69 (2d Cir. 2013) likewise explained that the link between what occurred in New York and the injury. Instead, all that is needed is a *relatedness*. <u>Licci</u> held:

> Claims "Arising From" a Transaction of Business. The Court of Appeals made clear that the "arising from" prong of section 302(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury. Instead, it requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Id. at 339, 984 N.E.2d at 900, 960 N.Y.S.2d at 702. According to the Court, whether a plaintiff's claim arises from a defendant's New York contacts depends upon "the nature and elements of the particular causes of action pleaded." Id. at 340, 984 N.E.2d at 901, 960 N.Y.S.2d at 703. However, section 302(a)(1) "does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." Id. at 341, 984 N.E.2d at 901, 960 N.Y.S.2d at 703.

Additionally, a tort can have several parts, each of which is sufficient to confer jurisdiction. <u>Longines-Wittnauer v. Barnes Reinecke</u>, 15 N.Y.2d 443, 470-71 (1965)(Concurrence noting: "the totality of an actionable tort such as is charged here (involving manufacturer's products liability) consists of three elements: defective manufacture, distribution to purchaser, and a resulting injury. Each of these is a "tortious act" or, in other words, a "part of a tort"."). Even one act in New York suffices. <u>Citigroup Inc. v. City Holding Co.</u>, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000); <u>Eades v. Kennedy, PC L. Offs.</u>, 799 F.3d 161 (2d Cir. 2015); <u>Kreutter v. McFadden Oil Corp.</u>, 71 N.Y.2d 460, 467 (1988) ("It is a "single act statute" and proof of one transaction in New York is sufficient

7

to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted").

### Due Process

For the reasons stated above, due process is also served by allowing the instant jurisdiction, though same was not directly argued against in the moving papers. The sale and tort occurred at the time of purchase in New York, and as stipulated on the record, defendant has substantial contacts with New York (Exhibit 6), and the record herein shows these contacts were just as related to any state's contacts with regard to defendant's failures to inspect and maintain.

### Leave to Amend

Based on the above, plaintiff moves for permission to amend their complaint to what is annexed as Exhibit 7 (see new paragraphs 7-8 for newly included allegations), to include the above mentioned bases for personal jurisdiction if deemed that same were not adequately pled. As defendant has not even answered the complaint yet, it is submitted that this application is reasonable and no prejudice will result.

### Motion To Dismiss Causes of Action

Defendant does not move to dismiss the Montreal Convention as a cause of action (aside from jurisdictional issues). With regard to defendant's other arguments, plaintiff opposes dismissing any claims at this stage, as defendant has not even answered. Hanna Kim v. Korean Air Lines Co., 513 F. Supp. 3d 462, 469 (D.N.J. 2021) ("the issue of whether the Convention has an ordinary preemptive effect on the claims here is not yet ripe. The application of ordinary preemption rules would occur in connection with a merits analysis"); DeJoseph v. Cont'l Airlines,

Inc., 18 F. Supp. 3d 595, 604 (D.N.J. 2014) (""these are matters for defense in the plaintiffs chosen state-court forum, not for preemption of the plaintiffs causes of action at the outset of the case").

Dated: July 28, 2023
New York, NY

> RHEINGOLD GIUFFRA RUFFO & PLOTKIN LLP
> *Attorneys for Plaintiffs*
>
> /s/ Jeremy A. Hellman
> _____
>
> By:   Thomas P. Giuffra
> 551 Fifth Avenue, 29th Floor
> New York, NY 10176
> Tel: (212) 684-1880
> Fax: (212) 689-8156
> jhellman@rheingoldlaw.com

I certify that a true copy of the above document was served upon each attorney of record by ECF on July 28, 2023

/s/ Jeremy A. Hellman